**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

KATHY CONTRERAS, on behalf
of her minor child A.L.,

      Plaintiff,

v.                                               Civ. No.  18-156 GBW/GJF

DONA ANA COUNTY BOARD
OF COUNTY COMMISSIONERS,
d/b/a Doña Ana County Detention Center, *et al.*,

      Defendants.

<u>**ORDER GRANTING DEFENDANTS'**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

This matter comes before the Court on Defendants' Motion and Supporting

Memorandum for Qualified Immunity and Summary Judgment.  *Doc. 47*.  Having

reviewed the Motion, the attendant briefing and oral argument (*docs. 52, 57, 60, 61, 64*),

and being otherwise fully advised regarding relevant case law, the Court will GRANT

Defendants' motion.

    **I.**      **PROCEDURAL POSTURE**

This case stems from events surrounding an assault on Plaintiff's minor child,

A.L., in the juvenile pod of the Doña Ana County Detention Center ("DACDC").  *Doc. 1.*

Plaintiff filed suit on behalf of A.L. in this Court on February 15, 2018.  *Id*.  In her

Complaint, Plaintiff brings federal and state law claims against the Doña Ana County

Board of County Commissioners, doing business as DACDC, and on-duty guards Paco Luna, Jaime Casado, and Shaylene Platero ("the Individual Defendants"). *Id.* Particularly, Plaintiff brings (1) claims against the Individual Defendants in their individual capacities for violating A.L.'s Fourteenth Amendment due process right to reasonable safety under 42 U.S.C. § 1983, (2) a §1983 municipal liability claim against DACDC, (3) state law claims against Defendants for negligence and negligent operation of a building or equipment, and (4) claims against Defendants under the New Mexico Constitution for the alleged violation of humane conditions of confinement. *Id.*

On July 13, 2018, Defendants filed a Motion for Summary Judgment, which was fully briefed on August 21, 2018. *Docs. 47*, *52, 57, 60*. In the Motion, Defendants seek summary judgment on Plaintiff's § 1983 claims on the basis of qualified immunity.[1] *See doc. 47* at 7–17. The Court held oral argument on the Motion on August 28, 2018. *Doc. 64*. During the hearing, the Court permitted the parties an additional week to file supplemental case citations and parentheticals relevant to the "cross-pollination of Eighth and Fourteenth Amendment analyses" and the "delegation of policy" arguments discussed by counsel during the hearing. *Id.* In response, Plaintiff filed her Notice of Additional Authority on August 30, 2018. *Doc. 61*. Defendants similarly filed a Notice of Additional Authority on August 31, 2018. *Doc. 62*. Defendants' Motion for Summary Judgment is now before the Court.

---

[1] The Motion does not address Plaintiff's claims arising under state law.

## II.    LEGAL STANDARDS

### A. QUALIFIED IMMUNITY & SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "show[ing] 'that there is an absence of evidence to support the nonmoving party's case.'" *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the movant meets this burden, the non-moving party is required to designate specific facts showing that "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Celotex*, 477 U.S. at 324.

Notably, however, summary judgment motions based upon the defense of qualified immunity are reviewed differently from other summary judgment motions. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id*. (*citing Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009)). This is a "strict two-part test" that must be met before the defendant asserting qualified

immunity again "bear[s] the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law."  *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (quoting *Nelson v. McMullen*, 207 F.3d 1202, 1205 (10th Cir. 2000)) (internal quotations omitted).  The Court may address the two prongs of the test in any order.  *Pearson*, 555 U.S. at 236.

"Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right."  *Id*. at 232 (*citing Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Creighton*, 483 U.S. at 640).  "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Id*. (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (quotation omitted).

In determining whether the plaintiff has met its burden, the Court still construes the facts in the light most favorable to the plaintiff as the non-moving party.  *See Scott v.*

*Harris*, 550 U.S. 372, 377 (2007).  In so doing, the Court must keep in mind three principles.  First, the Court's role is not to weigh the evidence, but to assess the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).  "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.  An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted).  Second, the Court must resolve all reasonable inferences and doubts in favor of the non-moving party and construe all evidence in the light most favorable to the non-moving party. *See Hunt v. Cromartie*, 526 U.S. 541, 550–55 (1999).  Third, the court cannot decide any issues of credibility. *See Liberty Lobby*, 477 U.S. at 255.  "[T]o survive the . . . motion, [the nonmovant] need only present evidence from which a jury might return a verdict in his favor." *Id*. at 257.  Nonetheless, at the summary judgment stage, "a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009).

## B.  INDIVIDUAL LIABILITY

The Fourteenth Amendment's due process clause governs pre-adjudication detainee suits against jails. *Bell v. Wolfish*, 441 U.S. 520, 536 (1979).  The Supreme Court has held

the following with respect to §1983 liability in cases that allege a failure to protect

inmates from other inmates, such as the one at bar.

> [P]rison officials . . . must take reasonable measures to guarantee the safety of the inmates. [Particularly,] prison officials have a duty…to protect prisoners from violence at the hands of other prisoners. . . . It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety. . . . First, the deprivation alleged must be, objectively, sufficiently serious, [and] the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. [S]econd[,] a prison official must have a sufficiently culpable state of mind. . . .that [of] deliberate indifference to inmate health or safety. . . . [A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk. We hold. . . that a prison official cannot be found liable. . . for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.

*Farmer v. Brennan*, 511 U.S. 825, 832–36 (1970) (internal quotations and citations

omitted).

Turning to the liability of supervisors in particular, to meet his or her supervisory

liability burden under §1983, a plaintiff must demonstrate that the supervisor:

> *[P]ersonally* violated [the plaintiff's] constitutional rights. To do that [the plaintiff must] show an affirmative link between [the supervisor] and [the violation.] And to demonstrate such an affirmative link, [the plaintiff must] establish (1) personal involvement, (2) causation, and (3) state of mind.
>
> [Plaintiff] could satisfy the personal-involvement requirement by showing that [the supervisor] was responsible for but failed to create and enforce policies to protect [the plaintiff] from the [violation]. To establish causation, [the plaintiff] had to show that [the supervisor] set in motion a series of events that [the supervisor] knew or reasonably should have

known would cause others to deprive [the plaintiff] of [the plaintiff's] constitutional rights. Finally, in the context of a Fourteenth Amendment claim like this one, [the plaintiff] could establish the requisite state of mind by showing that [the supervisor] acted with deliberate indifference.

In turn, the deliberate-indifference test itself has three requirements. [The plaintiff] had to show (1) that [the supervisor] was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed; (2) that he actually drew that inference; and (3) that he was aware of and failed to take reasonable steps to alleviate that risk.

*Perry v. Durborow*, 892 F.3d 1116, 1121–22 (10th Cir. 2018) (internal quotations and citations omitted). "A supervisor's mere knowledge of his subordinate's conduct" falls short of meeting the standard. *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th Cir. 2013) (internal citation omitted).

### C. MUNICIPAL LIABILITY

Municipalities cannot be held liable for the acts of their employees under 42 U.S.C. § 1983 on the basis of a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–94 (1978); *see also Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). Instead, "[a] plaintiff suing a municipality under section 1983 for the acts of one of its employees must prove: (1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional violation." *Myers v. Okla. Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998). In order to meet this burden, a plaintiff must first "identify a government's policy or custom that caused the injury." *Schneider*, 717 F.3d at 769 (internal quotations and citation omitted). The plaintiff is then required to show "that

the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Id.* The Tenth Circuit has distilled these requirements into three specific elements: "(1) official policy or custom[;] (2) causation[;] and (3) state of mind." *Id.*

An official policy or custom may take different forms. *See Cacioppo v. Town of Vail, Colo.*, 528 F. App'x 929, 931–32 (10th Cir. 2013) (unpublished). Specifically, "[a] challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Schneider*, 717 F.3d at 770. Proving an unlawful custom demands evidence of "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)) (internal quotation marks omitted). For liability to attach, the plaintiff must demonstrate a "direct causal link between the custom or policy and the violation alleged." *Hollingsworth v. Hill*, 110 F.3d 733, 742 (10th Cir. 1997) (internal citations omitted).

## III. UNDISPUTED FACTS

Based on the facts presented by the movants and other facts gleaned from the record, the Court finds the following facts to be undisputed for the purposes of

Defendants' Motion:

1. On May 3, 2016, A.L., a fourteen-year-old juvenile, was arrested and booked into DACDC.  *Doc. 47*-1 at 1.

2.  When A.L. was escorted to his cell, three other detainees in the pod, Joaquin Solis, Jesus Vasquez, and Adan Herrera, shouted threats at A.L., including that they planned to "fuck [A.L.] up."  *Doc. 47-2* at 1.

3. DACDC officer James Espana documented the threats against A.L. in an incident report.  *Doc. 47-2.*

4. Defendants Luna, Casado, and Platero, guards within the pod, were made aware of these threats.  *Doc. 47-3* at 1; *doc. 47-4* at 2; *doc. 47-5* at 1.  In addition, Defendant Luna noted that Solis, Vasquez and Herrera had histories of assault at DACDC.  *Id*. In fact, DACDC reported an assault involving Herrera and Vasquez as recently as April 30, 2016.  *Doc. 52-1*, Attachment 5.  Further, five previous "affrays" had been reported involving Solis, Herrera or Vasquez.  *Id.*, Attachment 6.  In addition, Luna recorded on April 25, 2016, that "it is not safe to take [Herrera] out of his cell."  *Id.*  A DACDC psychiatrist on April 29, 2016, also found that Herrera, who had been incarcerated ten times, is prone to anger and "risk taking activity," and suffers from auditory hallucinations.  *Id.*

5. DACDC placed Solis, Vasquez and Herrera on pre-disciplinary status, meaning they were only allowed out of their cells to shower, use the phone, use the inmate kiosk, and

participate in a one-hour recreation period. *Doc. 47-3* at 1. Further, DACDC did not permit the three detainees to leave their cells during the same period as each other or A.L. *Doc. 47-4* at 2.

6. On the morning of May 4, 2016, Sergeant Luna was on duty as the supervisor. *Id.* Officer Casado and Cadet Platero joined Defendant Luna on the shift. Prior to 9:00 a.m. Herrera showered in the shower room. *Id.* Simultaneously, the Individual Defendants watched television in the middle of the juvenile pod's dayroom, a first-floor rectangular common room filled with circular tables and surrounded by two floors of cells. *Id.* Detainees Solis, Vasquez, and A.L. remained locked in their cells. *Id.*

7. When Herrera finished showering, he entered the dayroom and asked Defendant Luna for permission to check the detainee commissary account kiosk, which Defendant Luna granted. *Doc. 47-3* at 2.

8. The commissary account kiosk is on the south wall of the day room and is between five feet and several yards from the pod's control panel. *See docs. 47* at 3, *47-3* at 2, 7.

9. The control panel is a touchscreen device that allows the user to lock or unlock individual cells with the touch of a button. *See doc. 47-3* at 7. Users may similarly log off or lock the panel with the touch of a button. *Id.*

10. The control panel, at approximately 9:00 a.m. on May 4, 2016, was unlocked. *Doc. 47-4* at 3.

11. Defendant Casado, stationed at the control panel, had moved away from it without

locking it or logging off.  *Id.*

12. Defendant Casado stated on one occasion that nobody on his shift logged off or locked the panel in the juvenile unit, and that he had never been directed to do so.  *Doc. 47-3 at 4.*

13. Defendant Platero knew that Defendant Casado had left the control panel unlocked but said nothing.  *Doc. 47-3 at 5; doc. 47-5 at 7.*

14. Defendant Luna was not aware that Defendant Casado had failed to lock the control panel.  *Doc. 47-3 at 2, 5.* [2]

15. The Individual Defendants sat approximately ten to fifteen yards from the control panel, which they could view.  *Doc. 64 at 2.*

16. At approximately 9:07 a.m., after reviewing his commissary account, Herrera paced to the control panel, accessed it, and opened the cell doors of A.L., Solis, and Vasquez, as well as his own, all on the second floor.  *Doc. 47-3 at 4.*

17. Solis and Vasquez immediately exited their cells, entered A.L.'s cell, closed the door

---

[2] In in a later-made affidavit, Casado acknowledges that he was told that the policy of DACDC was to log out of the control panel after use.  *Doc. 47-4 at 3.*  Similarly, in her own affidavit, Platero says that she was trained to always lock or log out of the control panel.  *Doc. 47-5 at 2-3.*  In addition, Defendant Luna, in his affidavit, contends that he had instructed Defendant Casado to lock all control panels, and similarly instructs all officers under his supervision to do so.  *Doc. 47-3 at 2.*  In the same vein, Defendant Luna contends that he never instructed a subordinate to leave a control panel unlocked, nor is he aware of any other supervising officers having done so.  *Id.* at 3.   However, Defendant Luna does acknowledge that DACDC never issued to him a directive to lock the control panel.  *Id.* at 5.  The Court merely notes these points to underscore the pervasiveness of the factual dispute surrounding DACDC control panel protocol.  However, construing the evidence in the light most favorable to Plaintiff, the Court concludes that DACDC did not have or enforce an express policy regarding locking of the control panel.

behind them, and began to beat A.L. *Doc. 47-4*, Attachments 2-3.

18. Herrera ran upstairs, entered his cell and closed the door behind him. *Doc. 47-4 at 3.*

19. Defendants Casado and Luna rushed upstairs and attempted but failed to open the door to A.L.'s cell, which had locked after Solis and Vasquez entered. *Id.*

20. An officer unlocked A.L.'s door by means of the control panel. *Doc. 47-3 at 4, 7.*

21. After approximately twenty seconds from its initiation, Defendant Luna stopped the attack by using OC spray. *Doc. 47-4*, Attachments 2-3.

22. The attack left A.L. unconscious, bleeding from both ears, and with a broken jaw. *Doc. 1 at 4.*

23. Beginning in 2014, until the date of the assault on Plaintiff, four incidents involving a detainee's illicit use of the control panel in the juvenile pod had been previously reported. *Doc. 52-1*, Attachment 6; *doc. 57-1.* Only two of them involved an attempt to assault another inmate. On October 25, 2014, a detainee opened his own door with the access panel. *See doc 57-1 at 2.* On February 12, 2015, a detainee touched the panel in defiance of contemporaneous orders to step away from the panel. There is no evidence that he opened any door and thus it is not clear that the access panel was unlocked. *Id*. at 3. However, on January 20, 2015, a detainee did use the control panel to open the cell of another inmate whom he then assaulted. *Doc. 57-1 at 1.* In addition, on November 23, 2014, a detainee used the control panel to open two cells resulting in a brawl involving four other detainees. *Id*. at 4.

# IV. ANALYSIS

### 1. THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY, BECAUSE PLAINTIFF HAS NOT MET HER BURDEN OF SHOWING THAT THE RIGHT THAT THE INDIVIDUAL DEFENDANTS ALLEGEDLY VIOLATED WAS CLEARLY ESTABLISHED.

Plaintiff, in her Complaint, brings § 1983 claims against the Individual Defendants for alleged violations of A.L.'s Fourteenth Amendment due process right to humane conditions of confinement, including his right to reasonable safety while in detention. *Doc. 1* at 6. In response, in their Motion for Summary Judgment, the Individual Defendants assert a qualified immunity defense. *Doc. 47.*

Specifically, the Individual Defendants argue that they did not violate A.L.'s constitutional rights under the Fourteenth Amendment because A.L. was not detained under conditions posing a substantial risk of harm, the Individual Defendants were not deliberately indifferent to A.L.'s safety, and Plaintiff cannot prove the existence of an affirmative link between the Individual Defendants' conduct and the assault on A.L. *Id*. In the alternative, they argue that, even if a constitutional violation did occur, Plaintiff fails to demonstrate that the violation was clearly established. *Id.*

In response, Plaintiff contends that the Individual Defendants personally violated A.L.'s Fourteenth Amendment due process right to reasonable safety for the following reasons. First, she notes that Defendant Casado's decision to leave the control panel unlocked, Defendant Platero's failure to report the decision despite her knowledge, and

Defendant Luna's failure to instruct his subordinates to lock the panel and correct actions contrary to this instruction placed A.L. at a substantial risk of harm at a time when he faced threats from three detainees with assault records in the juvenile pod, the control panel had been used in the past by detainees to open cells and attack fellow detainees, and Herrera stood within a short distance of the unlocked control panel while accessing his commissary account. *Doc. 52* at 5–8. Second, she underscores that each individual defendant was deliberately indifferent to A.L.'s safety, and advocates for an application of the objective standard introduced in *Kingsley* in the context of excessive force.[3] *Id.* at 8–10; *see Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015). Third, Plaintiff argues that the weight of authority has clearly established the violation, citing to cases from the Third, Seventh, Eighth, Tenth, and Eleventh Circuits, discussed below.[4] *Doc. 52* at 10–13.

When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established. *Pearson*, 555 U.S. at 231–32.

---

[3] Despite encouraging the Court to apply the objective standard, Plaintiff argues that even if the Court chooses to apply the subjective deliberate indifference standard, the standard is met here because the Individual Defendants were aware of the facts from which the inference could be drawn that a substantial risk of harm existed, they actually drew that inference, and they failed to take reasonable steps to alleviate that risk. *Id.* at 9–10.

[4] *See Walton v. Dawson*, 752 F.3d 1109, 1121 (8th Cir. 2014); *Irving v. Dormire*, 519 F.3d 441, 447 (8th Cir. 2008); *Newman v. Holmes*, 122 F.3d 650 (8th Cir. 1997); *Marsh v. Butler Cnty., Ala.*, 283 F.3d 1014 (11th Cir. 2001); *Pavlick v. Mifflin*, 90 F.3d 205 (7th Cir. 1996); *Riley v. Jeffes*, 777 F.2d 143 (3d. 1985); *Berry v. Muskogee*, 900 F.2d 1489 (10th Cir. 1990); *Howard v. Waide*, 534 F.3d 1227 (10th Cir. 2008).

Therefore, the Court must determine whether Plaintiff met her burden here. Regarding the first prong, while the Court is skeptical that the Individual Defendants possessed the deliberately indifferent state of mind required to find that they violated a constitutional right, the Court refrains from addressing that question because Plaintiff has failed to meet her second prong burden of showing that the right at issue was clearly established.

Qualified immunity protects officials as long as their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citations and quotations omitted). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards,* 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Al–Kidd,* 563 U.S. at 741. "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"Importantly, the Supreme Court has recently and frequently reminded [lower courts] that we can't 'define clearly established law at a high level of generality.'" *Bishop v. Szuba*, 2018 WL 3409907, *3 (10th Cir. July 12, 2018) (unpublished) (citations and quotations omitted). Instead, the "'clearly established' standard requires that the

legal principle clearly prohibit the officer's conduct in the particular circumstances before him. … This requires a high 'degree of specificity.' … A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Wesby*, 138 S. Ct. at 590 (citations omitted). Consequently, the clearly established inquiry is conducted in light of the specific factual context of the case, not as a broad general proposition. *See Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015); *see also White*, 137 S. Ct. at 552.

To put this approach into concrete terms, it is useful to consider the proper framing of the inquiry in a few recent cases. In *Mullenix*, the "Fifth Circuit [had] held that [the officer] violated the clearly established rule that a police officer may not "use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." 136 S. Ct. at 308-09. The Supreme Court emphatically rejected this formulation of the right as far too general. *Id*. Instead, the Court presented the correct formulation as follows:

> In this case, [the officer] confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer at Cemetery Road. The relevant inquiry is whether existing precedent placed the conclusion that [the officer] acted unreasonably in these circumstances "beyond debate."

*Id*. at 309. The importance of the factual context to the formulation can also be seen in *Sause v. Bauer*, 859 F.3d 1270, 1275 (10th Cir. 2017) (*rev'd on other grounds in* 138 S. Ct.

2561 (2018))[5], where the Tenth Circuit framed the relevant inquiry as involving "a scenario in which (1) officers involved in a legitimate investigation obtain consent to enter a private residence and (2) while there, ultimately cite an individual for violating the law but (3) in the interim, interrupt their investigation to order the individual to stop engaging in religiously-motivated conduct so that they can (4) briefly harass her before (5) issuing a citation." *See also Bishop*, 2018 WL 3409907 at *3 (formulation of the right cannot "fail[] to discuss the 'particularized' facts of th[e] case.").

After laying out the factual circumstances in a sufficiently specific fashion, the court must determine whether the official's conduct violated a clearly established rule. "To make this determination, we consider 'either if courts have previously ruled that *materially similar conduct* was unconstitutional, or if a general constitutional rule already identified in the decisional law applies with *obvious clarity* to the specific conduct at issue." *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964-65 (10th Cir. 2016) (emphasis in original) (quotation and citation omitted). In this circuit, the relevant precedent must come from the Supreme Court, the Tenth Circuit, or from the clearly established weight of authority from other courts. *See Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010); *see also Wesby,* 138 S. Ct. at 589-90 (To be clearly established, a legal principle must be

---

[5] The Supreme Court did not take issue with the Tenth Circuit's formulation as it related to the First Amendment claim. Instead, the Court reversed the grant of qualified immunity because the Tenth Circuit failed to address the Fourth Amendment claim inextricably intertwined with the plaintiff's First Amendment claim. *Sause v. Bauer*, 138 S. Ct. 2561, 2562-63 (2018).

"dictated by controlling authority or a robust consensus of cases of persuasive authority.") (internal quotations omitted).  When relying on authority from other courts, the Tenth Circuit "generally looks to whether a 'majority of courts' have adopted the rule in question."  *Sandberg v. Englewood, Colorado*, 727 F. App'x 950, 962 (10th Cir. 2018) (citing *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1131 (10th Cir. 2013)); *see also Gonzales v. City of Castle Rock*, 366 F.3d 1093, 1117-18 (10th Cir. 2004) (en banc) (somewhat analogous cases from two other circuits and two district court opinions with very similar facts insufficient to establish law in this circuit); *cf. Mayfield v. Bethards*, 826 F.3d 1252, 1259 (10th Cir. 2016) (consistent holdings from seven other circuits sufficient to establish law in this circuit).  Moreover, "it is not enough that the rule is suggested by then-existing precedent.  The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 138 S. Ct. at 590.

With these standards in mind, the material facts in the instant case are as follows: (1) after plaintiff was threatened by three other juvenile detainees, (2) they were immediately segregated from each other in cells which were locked and properly functioning, but (3) a guard did not digitally lock an touchscreen panel which controlled the locks on the cell doors in the cell block, and (4) despite the fact that the control panel was monitored visually by several guards who were seated nearby, (5) one of the juveniles who had threatened plaintiff succeeded in accessing the panel and using it to

open the cell doors of plaintiff and two other threatening juveniles, (6) enabling the two other threatening juveniles to assault plaintiff.

Plaintiff was a pretrial detainee and therefore his claim is governed by the Fourteenth Amendment's due process clause. *Bell*, 441 U.S. at 536. The Supreme Court has undeniably held that prison officials have a duty to take reasonable measures to protect prisoners from violence committed by fellow prisoners. *Farmer*, 511 U.S. at 832. "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. "In determining whether pretrial detainee's rights were violated, we apply an analysis identical to that applied in Eight Amendment cases brought pursuant to § 1983." *Perry v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018) (quoting *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999)). "For a claim (like the one here) based on a failure to prevent harm, the [plaintiff] must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. 834. Second, a plaintiff must establish that the defendant possessed a "sufficiently culpable state of mind. [In a case such as this one,] that state of mind is 'deliberate indifference' to inmate health or safety." *Id.* (citations omitted). In both Eighth and Fourteenth Amendment cases, the deliberate-indifference test itself has three requirements: (1) that the defendant "was 'aware of facts from which the inference could be drawn that a

substantial risk of serious harm existed'; (2) that he actually drew that inference;[6] and (3) that he was 'aware of and failed to take reasonable steps to alleviate that risk.'" *Perry*, 892 F.3d at 1122 (quoting *Keith v. Koerner*, 843 F.3d 833, 848 (10th Cir. 2016)).

Knowing the legal requirements to show a constitutional violation and the material facts of the instant case, the Court now turns to the relevant inquiry: does existing precedent place the conclusion that the Individual Defendants violated Plaintiff's constitutional rights in these circumstances "beyond debate." Looking to the cases cited by Plaintiff and those discovered *sua sponte*, the Court finds that it does not.

Before conducting a close review of the relevant precedent, the Court must first address Plaintiff's argument that this is "an obvious case." As noted above, the clearly-established hurdle can be cleared "if a general constitutional rule already identified in the decisional law applies with *obvious clarity* to the specific conduct at issue." *Estate of Reat*, 824 F.3d at 964-65 (emphasis in original) (quotation and citation omitted). The

---

[6] In *Perry*, the court noted that the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2016) may have undermined the application of this "subjective" deliberate indifference requirement in Fourteenth Amendment cases. *Perry*, 892 F.3d 1116, 1122 n.1 (10th Cir. 2018). In *Kingsley*, the Supreme Court held that a pre-trial detainee bringing a Fourteenth Amendment excessive force case need only show force used was objectively unreasonable. *Kingsley*, 135 S. Ct. at 2473. Nonetheless, the *Perry* court applied the subjective deliberate indifference standard to a Fourteenth Amendment protection from harm claim. *Perry*, 892 F.3d at 1121-26. Were this court addressing the first prong of the qualified immunity analysis, it would be necessary to resolve this issue because Plaintiff has raised it. *Compare id*. at 1122, n.1 (noting the absence of briefing on the issue by either party). However, in the context of the clearly-established prong of the analysis, it suffices to say that, as of May 4, 2016, the impact of *Kingsley* on a protection from harm claim as brought here was not clearly established. As such, the lower objective standard cannot be applied at this stage. *Id*. (noting that to overcome qualified-immunity defense, "plaintiff must demonstrate ... that the right was clearly established *at the time of the alleged unlawful activity*") (quoting *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009)).

Supreme Court has hypothesized "the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (quotation omitted). While the obviousness of a violation is a vague standard, this Court finds this case to be far from an obvious case of deliberate indifference (by any of the Individual Defendants) to the safety of Plaintiff. The prison officials responded appropriately to the original threats toward Plaintiff made by the three inmates. They segregated the three detainees from each other and Plaintiff – each in a separate locked cell. The locks on the cells were engaged and functional. Only one detainee was permitted outside their cell at a time, and only for limited time and for limited purposes. No fewer than three guards were present inside the pod at the relevant time. From their position, they could observe the cells of the three detainees, Plaintiff and the panel controlling the door locks.

Essentially, the officials made two errors. First, Defendant Casado walked away from the access panel without digitally locking it. Second, Defendant Luna authorized detainee Herrera to utilize the detainee account kiosk, which was a few yards away from the control panel. These two actions permitted the detainee Herrera– who had apparently conspired with detainees Vasquez and Solis – to reach the control panel and unlock the relevant cell doors before the guards could react and stop him. While these errors make a strong case for negligence, they fall well short of an obvious case of reckless indifference. *See, e.g., Davidson v. Cannon*, 474 U.S. 344, 345-48 (1986) (where

prison officials failed to address the petitioner's note reporting a fellow inmate's threats and indicating that he feared attack and the threatening inmate attacked the petitioner two days after receipt of the note, officials were at most negligent and not liable pursuant to § 1983); *Perry*, 892 F.3d at 1120-27 (no finding of reckless indifference on the part of the supervisor where male guard raped female inmate even though supervisor was aware male officers regularly entered and remained in female pod  in violation of jail's emergency-only policy, and was aware that the jail's surveillance system did not monitor the female pod's individual cells, its showers, or its mechanical rooms); *Patton v. Rowell*, 678 F. App'x. 898 (11th Cir. 2017) (unpublished) (no finding of reckless indifference where officials knowingly failed to lock the attacker's slide bolt and did not check the corresponding cell door lock, because they did not know that the inmate had stuck tissue paper into the lock to prevent it from functioning, enabling the inmate to escape and attack the plaintiff); *Lesley v. Whetsel*, 110 F. App'x 851 (10th Cir. 2004) (finding mere negligence where officer simultaneously opened the cells of inmate and his attacker, in violation of prison rules, resulting in an assault).

Because this case is not an "obvious" one, the Court must review precedent to determine if the Supreme Court, the Tenth Circuit or the clearly established weight of authority from other courts "ha[s] previously ruled that *materially similar conduct* was unconstitutional[.]" Estate *of Reat*, 824 F.3d at 964-65; s*ee Clark*, 625 F.3d at 690.  Plaintiff has cited a number of cases and the Court has considered several others in which

guards permitted the assault of an inmate (or pre-trial detainee) by a fellow inmate (or pre-trial detainee).  Where important similarities exist, comparison to the instant case will be done in categories.

In the first category of cases, fellow inmates or detainees assaulted the plaintiff after an on-duty guard unlocked cells.  *See Irving v. Dormire*, 519 F.3d 441, 447 (8th Cir. 2008) (finding that the correction officer's conduct in opening cell doors in order to allow an inmate to attack the plaintiff was sufficiently serious to support a failure to protect claim); *Pavlick*, 90 F.3d at 205 (inmates attacked the plaintiff after an officer unlocked the door to the plaintiff's cell and walked away); *Newman*, 122 F.3d at 650 (an inmate assaulted the plaintiff after an officer hit an override button on a control panel, thereby unlocking cells).  These cases are easily distinguished from the case at bar, because the attack on A.L. did not result from any individual defendant's act of unlocking the cells; rather, detainee Herrera unlocked the cells by means of unsanctioned access to the control panel coupled with a conspiracy with two other detainees.  This material distinction means that these cases cannot clearly establish a constitutional violation in the instant case.  *See, e.g., Sandberg*, 727 F. App'x at 963 (First Amendment right for subject of police action to record the police in public was not clearly established by precedent establishing right of bystander or third party to do so).

In the second category of cases, the assault occurred because the cell locks themselves were defective or not utilized.  *See Junior v. Anderson*, 724 F.3d 812 (7th Cir.

2013) (reversing grant of summary judgment where inmates attacked the plaintiff by entering his cell, which a prison guard had previously noted was not securely locked); *Marsh v. Butler Cty., Ala.,* 268 F.3d at 1024 (abrogated on other grounds) (reversing 12(b)(6) dismissal on basis of qualified immunity where inmates succeeded in attacking the plaintiffs because the locks to the doors of the inmates' cells did not work and guards did not monitor the cells by means of any visual or audio surveillance system); *Walton v. Dawson*, 752 F.3d 1109, 1114–15 (8th Cir. 2014) (affirming denial of summary judgment based on qualified immunity on Fourteenth Amendment claim where a jailer never locked the cells at night, enabling a detainee to enter the plaintiff's cell unobserved and rape him); *Berry v. City of Muskogee*, 900 F.2d 1489 (10th Cir. 1990) (affirming judgment in favor of plaintiff on Eighth Amendment claim whose husband was killed by fellow inmates in jail where (i) all "federal" prisoners were housed in one section where their cells remained unlocked at all times, (ii) no policy existed for segregating cooperating defendants from their co-defendants, (iii) jail officials had been advised that decedent had cooperated against other defendants housed in the section, and (iv) only one guard was on duty to supervise the entire prison); *Martin v. White*, 742 F.2d 469 (8th Cir. 1984) (reversing directed verdict for prison officials on Eighth Amendment violation based on inmate assault where assailant was able to enter plaintiff's cell because (i) guards were stationed where they could provide little protection to inmates, (ii) plaintiff's cell lock was defective such that it was easy to

"pick" with only a paperclip, (iii) the prison had no procedure by which to discover defective locks which were so prevalent as to "allow[] violent inmates to freely enter other inmates' cells, and (iv) the Superintendent's policies as a whole appeared to "actually encourage[] inmates to attack others with impunity"); *Byron v. Dart*, 825 F. Supp. 2d 958 (N.D. Ill. 2011) (denying a motion to dismiss a Fourteenth Amendment claim where officials failed to repair a known faulty cell door that could be popped open, resulting in an attack on the plaintiff by fellow detainees). In the instant case, however, this material fact is missing. In fact, the locks on each relevant cell door was completely functional and engaged just moments before the attack. Admittedly, one could argue that using the control panel was a digital version of lockpicking and that, by leaving the panel unlocked, the guard had rendered it functionally defective. The Court would reject this putative analogy. In the cases above, the locks were unused or mechanically defective such that the cells remained effectively unlocked hour after hour and day after day. The risk of an inmate assault inherent in such a circumstance is quite different than the risk resulting from the Individual Defendants' conduct here. Moreover, the cases listed above differed in at least one other material way. In addition to the cell doors not being effectively locked, the cells were not meaningfully surveilled by guards for significant periods, including the time of the assault. *See id*. Coupled with the unlocked cells, this fact virtually guaranteed inmate on inmate assaults. The present case lacks this key aggravating component. Instead, three guards were

physically present and supervising the pod at the time. These material distinctions mean that this category of cases cannot clearly establish a constitutional violation in the instant case.[7] *See, e.g., Estate of Reat*, 824 F.3d at 964-67 (state-created danger not clearly established for 911 operator based on precedents applying it to police officers, firefighters and other similar first responders).

While it does not fit perfectly into the second category above, *Riley v. Jeffes* is also materially distinct from the instant case. *Riley*, 777 F.2d 143 (3d Cir. 1985). In *Riley*, prison officials gave security lock keys to inmates for fourteen hours of every day. *Id*. at 146. This extraordinary practice "allow[ed] dangerous inmates to have control and possession of keys and to keep cell block doors open." *Id*. at 145. The clear risk of this practice was dramatically aggravated because "often times no correctional officer [was] around" and significant portions of the cell block "[were] completely cut off from the central desk vision, observation and view [.]" *Id.* at 146. As the court explained, "[t]he tension and danger to prisoners must be particularly intensified and pervasive where an overpopulated prison is occupied by aggressive felons prone to violence … who also have ready access to cells when the occupants are asleep and unprotected by prison

---

[7] It is also questionable that *Martin v. White*, 742 F.2d 469 (8th Cir. 1984) can add its heft to the weight of authority from other courts when considering whether the law is clearly established because it was premised on a rule that required a lesser showing than *Farmer* later demanded. *See Jensen v. Clarke*, 73 F.3d 808, 811 (8th Cir. 1996) (recognizing abrogation of *Martin* by *Farmer*). This same deficiency may also apply to *Berry v. City of Muskogee*, 900 F.2d 1489, 1494-96 (10th Cir. 1990) which pre-dated *Farmer* and does not appear to have applied the subjective deliberate indifference standard of *Farmer*. Notably, under the apparently objective deliberate indifference standard applied in *Berry*, the court still noted that "it [wa]s a somewhat close call" whether the facts established deliberate indifference. *Id*. at 1498.

guards." *Id*. at 145. Consequently, the court reversed the trial judge's dismissal of the plaintiff's Eighth Amendment claim under Rule 12(b)(6) because the "plaintiff ha[d] alleged a pervasive risk of harm to inmates from other prisoners and that the prison officials have failed to exercise necessary care to protect the safety of the inmates." *Id*. at 148.[8] Even though the locks in *Riley* may have mechanically worked, the cell doors were effectively unlocked for fourteen hours of every day. Worse yet, the control over the status of the cell doors during that period was held by inmates. And finally, based on the allegations in the complaint, the cells were almost completed unsupervised either by line of sight or video surveillance. These circumstances resulted in prisoners living in almost constant fear of assault from fellow inmates. Therefore, the distinctions between *Riley* and the instant case are so stark that it cannot be considered in the weight of authority to clearly establish a violation here.

Two final relevant Tenth Circuit cases remain to be considered. In *Lopez v. LeMaster*, the court reversed a grant of summary judgment to the sheriff where the plaintiff, a pre-trial detainee, was assaulted by other inmates. *Lopez*, 172 F.3d 756 (10th Cir. 1999). The events began when the plaintiff was threatened by another inmate and immediately notified the jailer on duty. *Id*. at 758. After taking the plaintiff's statement and the plaintiff advising him that "he was afraid to go back to the general population

---

[8] It should be noted that *Riley* is also a pre-*Farmer* case. Therefore, it did not appear to utilize the subjective deliberate indifference standard laid out therein. *See Riley v. Jeffes*, 777 F.2d 143, 147 n.8 (3d Cir. 1985).

cell because he thought the inmates there would jump him[, the] jailer … returned [plaintiff] to the cell." *Id*. at 758-59. Five minutes later, the plaintiff was attacked by two cellmates. *Id*. at 759. Clearly demonstrating the lack of supervision by the jailer, the assault lasted between five and ten minutes (during which two additional cellmates joined in) without any intervention by the jailer. *Id*. Plaintiff argued that the assault occurred due to "constitutionally inadequate conditions at the jail which may have prevented the jailer from acting, such as understaffing, lack of monitoring equipment or lack of a means by which inmates could contact the guards."[9] *Id*. at 760. The court reversed the grant of summary judgment on this claim for the sheriff. *Id*. at 762. In short, the court held that, where (i) plaintiff was returned to a cell containing individuals who had threatened him, (ii) the jail was woefully understaffed such that he was the only jailer on duty, (iii) there was no video surveillance to assist the on-duty staff to supervise, and (iv) the sheriff was aware on the dire staffing and surveillance issues from previous critical reports noting "deficiencies in staff and backup, training, and supervision of inmates," the plaintiff "supplied sufficient evidence to survive summary judgment on his [Fourteenth Amendment] claim against [the sheriff] for failure to protect him from assault by his fellow inmates." *Id*. at 761-62. Again, the

_____

[9] The plaintiff also presented an argument based only on the fact that he was injured because his jailer returned him to the cell after being threatened. *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999). Summary judgment on this basis was granted because the claim was brought against the sheriff (not the jailer) and plaintiff failed to show a lack of relevant training by the sheriff. *Id*. at 760.

instant case is materially different from these facts. On top of a complete failure to even attempt to segregate the *Lopez* plaintiff from those who had just threatened him, the endemic lack of staffing and reasonable surveillance of the prisoners virtually guaranteed that the *Lopez* plaintiff would be assaulted. In contrast, the guards in the instant case immediately segregated Plaintiff from the juveniles who had threatened him. They did so in cells that were locked and completely functioning. Moreover, at the time of the assault, three guards were present in and supervising a relatively small pod. While they may have been negligent in permitting one of the co-conspirators to reach and access the unlocked control panel, the deficiencies fall well short of those in *Lopez*.

The final important case for comparison is *Howard v. Waide* in which the court reversed a grant of summary judgment on an Eighth Amendment claim of failure to protect. 534 F.3d 1227 (10th Cir. 2008). In *Howard*, the plaintiff was "a non-violent offender who [was] openly homosexual, of slight build, and unusually vulnerable to predators[.]" *Id*. at 1230. At the prison where he was originally housed, he was sexually and physically assaulted on numerous occasions by members of the "2-11" prison gang. *Id*. at 1230-31. Because of these assaults, he was transferred to a different prison. *Id*. at 1231. Plaintiff repeatedly advised the prison officials there of his prior problems with and continued fear of the "2-11" prison gang. *Id*. Initially, plaintiff was placed in a high security housing unit. *Id*. However, some months later, he was moved to a different

housing unit which provided relatively less supervision and fewer restrictions on contact between inmates. *Id*. There, plaintiff encountered a "2-11" prison gang member who told plaintiff that "Ghost," the "2-11" gang member who had been responsible for the assaults at the previous prison, "has a friend here[.]" *Id*. The plaintiff reasonably interpreted this statement as a threat, informed prison officials and asked to be moved to another housing unit. *Id*. The request was denied, and plaintiff pursued the matter through the grievance process. *Id*. at 1232. During this process, prison officials told him that "he would 'have to learn to live with' threats of violence [and] that 'crime just doesn't pay.'" *Id*. Despite the denials of transfer based upon his expressed fear, prison officials did transfer him to another housing unit (at the same security level) "because he 'filed too many grievances.'" *Id*. at 1232-33. In this new housing unit, he was quickly approached by a "2-11" gang member who extorted him for money and threatened him on behalf of "Ghost." *Id*. at 1233. Within a matter of weeks, plaintiff was sexually assaulted on two separate occasions. *Id*. Under these facts, the Tenth Circuit held that the plaintiff had "presented adequate evidence to survive summary judgment" on his failure to protect claim. *Id*. at 1241. As with the cases above, the facts in *Howard* are so materially different from the instant case that they do not put the issue of deliberate indifference in the instant case "beyond debate." *Howard* involved repeated refusals over an extended time to even attempt to segregate an inmate from those who threatened him harm. Moreover, the threats ignored by prison officials in *Howard* were

not merely words – they were continuations of actual physical and sexual assaults by the same prison gang against the *Howard* plaintiff of which the prison officials were well aware. As noted before, the guards in the instant case immediately segregated Plaintiff from the juveniles who had threatened him even when those threats were merely verbal. They did so in cells that were locked and completely functioning. While the segregation failed because of their momentary failure in permitting one of the co-conspirators to reach and access the unlocked control panel, the deficiencies fall well short of those in *Howard*.

In conclusion, the relevant inquiry is whether existing precedent (either from the Supreme Court, Tenth Circuit or the weight of authority from other courts) places the conclusion that Defendants acted with deliberate indifference to Plaintiff's well-being in these circumstances "beyond debate." Reviewing the applicable cases and the material facts, the Court finds that this case is neither an obvious case of reckless indifference nor has adequate authority previously ruled that materially similar conduct was unconstitutional. As such, Plaintiff fails to meet his burden that to show that the individual Defendants' conduct violated a clearly established constitutional right. Thus, the individual Defendants are entitled to qualified immunity.

## 2. Plaintiff Cannot Show that DACDC Acted with Deliberate Indifference as Required to Prevail on the Municipal Liability Claim.

The Court now turns to Plaintiff's municipal liability claim. Plaintiff, in her Complaint, brings a municipal liability claim under § 1983 against Doña Ana County Board of County Commissioners, doing business as DACDC, for propagating a policy of "failing to properly guard [] detainees" and neglecting to train detention officers to safeguard the control panel in the juvenile unit, resulting in the violation of A.L.'s Fourteenth Amendment due process right to reasonable safety. *Doc. 1* at 7.[10] To establish municipal liability, Plaintiff must prove three elements: "(1) official policy or custom, (2) causation, and (3) state of mind." *Schneider*, 717 F.3d at 769. The Court need not address each element because Plaintiff fails to establish the third element as a matter of law.

With respect to the third element, the "prevailing state of mind standard for a municipality is deliberate indifference regardless of the nature of the underlying

---

[10] Although neither party discusses the claim that DACDC failed to implement adequate policies to document threats against the juveniles they housed, the Court will address this issue briefly. *See doc. 1,* ¶60. Of course, municipal liability can only follow if its conduct (either through policy, practice or failure to train) was the "moving force" behind the constitutional violation. *See City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989). Here, it is undisputed that DACDC immediately documented the first threats made by Herrera, Solis, and Vasquez against A.L. and quickly placed Herrera, Solis and Vasquez on pre-disciplinary status in order to avoid future confrontations. *Doc. 47-2.* The incident that occurred following Officer Espana's documentation of the threat could not have been prevented by adoption of a more elaborate system to document the threats made by detainees. As such, no reasonable jury could find municipal liability on this basis.

constitutional violation." *Id*. at 771, n.5; *see also Ware v. Unified School Dist.*, 902 F.2d 815, 819 (10th Cir. 1990); *Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 757 (5th Cir.1993) ("The circuits have uniformly interpreted *Canton*'s 'deliberate indifference' requirement, announced in the context of a 'failure to train' claim, to apply to all cases involving facially constitutional policies."). "But 'a municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established.'" *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 994 (6th Cir. 2017); *see also Szabla v. City of Brooklyn Park, Minn*, 486 F.3d 385, 393 (8th Cir. 2007) ("[W]e agree with the Second Circuit and several district courts that a municipal policymaker cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not yet been clearly established.") (citing *Townes v. City of New York*, 176 F.3d 138, 143-44 (2d Cir. 1999) and other cases). As other courts have explained, this rule does not impermissibly grant municipalities qualified immunity:

> In *Owen* and *Pembaur*, it's true, the Court held that municipalities may not invoke the qualified immunity hurdle of clearly established rights. But that was because neither case arose from claims of deliberate municipal indifference. The municipalities themselves directly caused each constitutional injury. *See Owen v. City of Indep.*, 445 U.S. 622, 633 (1980); *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). That contrasts with a deliberate-indifference case, where the causal link between the city's failure to train and the injury is more attenuated. In a deliberate-indifference case, the claimant must show not only that an employee's act caused a constitutional tort, but also that the city's failure to train its employees caused the employee's violation *and* that the city culpably declined to train its "employees to handle recurring situations presenting

> an obvious potential for such a violation." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997); *see Szabla*, 486 F.3d at 393. "[O]bvious potential for such a violation" has two elements: It must be obvious that the failure to train will lead to certain conduct, *and* it must be obvious (i.e., clearly established) that the conduct will violate constitutional rights. As Judge Colloton pointed out in his opinion for the en banc Eighth Circuit in *Szabla*, requiring that the right be clearly established does not give qualified immunity to municipalities; it simply follows *City of Canton*'s and *Brown*'s demand that deliberate indifference in fact be deliberate. *Szabla*, 486 F.3d at 394.

*Arrington-Bey*, 858 F.3d at 995 (emphasis in original). Here, as in *Arrington-Bey*, Plaintiff raises a deliberate-indifference training claim, because she "does not point to any allegedly unconstitutional express policy or municipal act, but instead relies on the *absence* of a policy and the failure of [the defendant] or its final policymakers to train [] jailers about [the security risk at issue]." *Id.* With a deliberate indifference claim, Plaintiff is required to show that the allegedly violated right was clearly established, and without such a showing, her claim fails.[11] *Id.; see also Townes v. City of New York*, 176 F.3d 138, 143 (2d. 1999) ("municipal liability under a failure to train theory requires, in part, that municipal employees violate or are likely to violate a clearly established federal constitutional right."); *Williamson v. City of Virginia Beach*, 786 F. Supp. 1238,

---

[11] Plaintiff concedes that DACDC and its municipal policymakers had not implemented any policy related to safeguarding the control panel, but instead delegated the decision whether to log off or lock the panel to the discretion of the individual guards. *Doc. 60*. The Court rejects Plaintiff's argument that DACDC's delegation of discretion to individual guards gave *each* individual guard policymaking authority. *See Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986) ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."). Therefore, this case falls into the category of cases in which the plaintiff relies on the absence of a policy and the failure of the defendants or its final policymakers to train jailers about the security risk at issue.

1264–65 (E.D. Va. 1992) ("[even if] the constitutional rights alleged by plaintiff did exist, the conclusion that they were not clearly established negates the proposition that [the defendant] acted with deliberate indifference"), *aff'd*, 991 F.2d 793 (4th Cir. 1993). Because the right at issue has not been clearly established, Plaintiff cannot show that DACDC was deliberately indifferent.

While the Court is persuaded by the approach of the Second, Sixth and Eighth Circuits, the Tenth Circuit has not had an occasion to expressly address it. Alternatively, even if the Tenth Circuit were to conclude that a right need not be clearly established to prove deliberate indifference by a municipality, DACDC would be entitled to summary judgment. As the Tenth Circuit has explained,

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction.

*Schneider*, 717 F.3d at 771 (quotations and citations omitted). Based on the summary judgment record, no reasonable jury could find that Plaintiff satisfies this high bar.

The Supreme Court has emphasized the rarity of the "narrow range of circumstances" exception:

> In *Canton*, the Court left open the possibility that, "in a narrow range of circumstances," a pattern of similar violations might not be necessary to

show deliberate indifference.  The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force.  Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights.  The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.

*Connick v. Thompson*, 563 U.S. 51, 63-64 (2011) (citations omitted).  "Accordingly, single-incident liability is predicated on (1) the likelihood that a police officer will be confronted with a specific situation and (2) the predictability that an officer, when confronted with that situation, will violate a person's constitutional rights."  *Davis v. City of Montgomery*, 220 F. Supp. 3d 1275, 1284 (M.D. Ala. 2016).  It seems clear that the failure, in the instant case, to establish a policy or training about digitally locking the control panel does not meet these prerequisites.  Certainly, Plaintiff has not provided any evidence that a violation was "highly predictable" in this context.

Consequently, Plaintiff must show a "pattern of tortious conduct" such that DACDC's failure to train on digitally locking the control panel was "substantially certain to result in a constitutional violation."  *Schneider*, 717 F.3d at 771.  Based on the summary judgment record, no reasonable jury could make that finding.  In the twenty-eight months prior to the assault on Plaintiff by his fellow juvenile detainees, there have

been only two other instances where an assault resulted from a detainee accessing the control panel and opening a cell door. The event closest in time to the assault on Plaintiff was fifteen months earlier. These two incidents do not establish a pattern of tortious conduct adequate to demonstrate deliberate indifference. *See, e.g. Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 655 (N.D. Tex. 2018) ("A single violation or even a handful of violations likely will not be enough for a court to conclude that a municipality maintained the policy with deliberate indifference to the rights of persons within its jurisdiction."). Thus, even without considering the lack of a clearly established right, Plaintiff cannot prove deliberate indifference by DACDC.

For each of these independent reasons, DACDC is entitled to summary judgment on the municipal liability claim.

## V. RESOLUTION OF REMAINING CLAIMS

The rulings above dispose of Count I and Count II of Plaintiff's Complaint. *See doc. 1*. The remaining claims are based on state law and no diversity jurisdiction is alleged. *See docs. 1, 4*. Consequently, any jurisdiction over this claim would be an exercise of the Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367. Upon dismissal of Plaintiff's federal claims, this Court must decide whether or not it will adjudicate any remaining state law claims. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."). When all federal claims

have been dismissed from a case, supplemental state claims will ordinarily be dismissed without prejudice. *Roe v. Cheyenne Mountain Conference Resort*, 124 F.3d 1221, 1237 (10th Cir. 1997). As the Court sees no reason to depart from the ordinary rule, it will decline to exercise jurisdiction over Plaintiff's remaining state law claims and dismiss them without prejudice.

## VI.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment. *Doc. 47*. Therefore, Plaintiff's federal claims brought under 42 U.S.C. § 1983 are DISMISSED WITH PREJUDICE. Finally, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state claims, and they are DISMISSED WITHOUT PREJUDICE.

**IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by consent**